IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | |
|---|---|
| COBBLESTONE WIRELESS, LLC,<br>  Plaintiff,<br><br>v.<br><br>T-MOBILE USA, INC.<br>  Defendant,<br><br>NOKIA OF AMERICA CORPORATION,<br>ERICSSON INC.<br>  Intervenors. | Case No. 2:22-cv-00477-JRG-RSP<br>(Lead Case)<br><br>**JURY TRIAL DEMANDED** |
| COBBLESTONE WIRELESS, LLC,<br>  Plaintiff,<br><br>v.<br><br>AT&T SERVICES INC.; AT&T MOBILITY<br>LLC; AT&T CORP.<br>  Defendant,<br><br>NOKIA OF AMERICA CORPORATION,<br>ERICSSON INC.<br>  Intervenors. | Case No. 2:22-cv-00474-JRG-RSP<br>(Member Case)<br><br>**JURY TRIAL DEMANDED** |
| COBBLESTONE WIRELESS, LLC,<br>  Plaintiff,<br><br>v.<br><br>CELLCO PARTNERSHIP D/B/A VERIZON<br>WIRELESS.<br>  Defendant,<br><br>NOKIA OF AMERICA CORPORATION,<br>ERICSSON INC.<br>  Intervenors. | Case No. 2:22-cv-00478-JRG-RSP<br>(Member Case)<br><br>**JURY TRIAL DEMANDED** |

**PLAINTIFF COBBLESTONE WIRELESS, LLC'S OPPOSITION TO DEFENDANTS'
AND INTERVENORS' MOTION TO EXCLUDE THE EXPERT OPINIONS OF
STEPHEN E. DELL UNDER FED. R. EVID. 702 AND *DAUBERT***

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................................. 1

II.  OVERVIEW OF DELL'S OPINIONS AND METHODOLOGIES ..................................... 1

   A.   Dell apportioned royalty bases for each Defendant on a patent-specific basis to be limited to use of and benefits tied to the patented features. ................................................................. 1

      1.   Step 1A: '347 Patent-Specific Apportionment ............................................................. 2

      2.   Step 1B: '361 Patent-Specific Apportionment ............................................................. 4

      3.   Step 1C: '888 Patent-Specific Apportionment ............................................................. 5

   B.   Step 2: Dell derives a royalty rate for each Asserted Patent based on his analysis the *Georgia Pacific* factors, including his analysis of comparable licenses Intervenor Ericsson produced in this case. .................................................................................................................. 5

   C.   Step 3: Dell applies his computed royalty rates to the apportioned number of each Defendants' subscriber months for each Asserted Patent. ........................................................... 7

III. ARGUMENT ......................................................................................................................... 8

   A.   Dell's use of the apportioned number of subscriber months is reflective of the value of the patented technology to Defendants. ....................................................................................... 8

   B.   Dell does not invoke the entire market value rule, but rather apportions his royalty bases to only capture revenue directly tied to infringing functionalities. ......................................... 11

   C.   Dell does not ignore the purchase price of the Asserted Patents. ..................................... 13

   D.   Dell's 3-5% essentiality approximation for Ericsson's declared 5G patents is sufficiently tied to the facts of the case. ......................................................................................................... 13

# TABLE OF AUTHORITIES

**Cases**

*Alacritech Inc. v. CenturyLink, Inc.*,
  No. 2:16-cv-00693-RWS-RSP, 2023 WL 6553832 (E.D. Tex. Oct. 8, 2023) .......................... 10

*Cal. Inst. of Tech. v. Broadcom Ltd.*,
  25 F.4th 976 (Fed. Cir. 2022) ................................................................................. 8, 9, 10, 11

*Commonwealth Sci. & Indus. Research Org. v. Cisco Sys., Inc.*,
  No. 6:11-cv-343, 2014 WL 3805817 (E.D. Tex. July 23, 2014) .............................................. 11

*In re Innovatio IP Ventures, LLC Patent Litig.*,
  MDL Docket No. 2303, No. 11-cv-9308, 2013 WL 5593609 (N.D. Ill. Oct. 3, 2013) ............ 15

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
  694 F.3d 51 (Fed. Cir. 2012) .................................................................................................. 12

*Odyssey Wireless, Inc. v. Apple Inc.*,
  No. 15-cv-01735-H-RBB, 2016 WL 7644790 (S.D. Cal. Sept. 14, 2016) .............................. 14

*Pavo Solutions, LLC v. Kingston Tech. Co.*,
  35 F.4th 1367 (Fed. Cir. 2022) ................................................................................................ 11

*Sprint Commc'ns Co. v. Charter Commc'ns, Inc.*,
  No. 17-cv-1734, 2021 WL 982729 (D. Del. Mar. 16, 2021) .................................................. 14

*Stickle v. Heublein, Inc.*,
  716 F.2d 1550 (Fed. Cir. 1983) ................................................................................................ 9

*Uniloc USA, Inc. v. Microsoft Corp.*,
  632 F.3d 1292 (Fed. Cir. 2011) ......................................................................................... 12, 14

**Statutes**

35 U.S.C. § 284 ................................................................................................................................ 11

I. INTRODUCTION

Defendants' motion to exclude the testimony of Plaintiff Cobblestone's damages expert Stephen E. Dell should be denied in its entirety. Dell applied reliable, accepted methodologies that are specifically tied to the facts of the case against each carrier Defendant.

Dell does not invoke the "entire market value rule" (EMVR) as Defendants allege, as he worked in conjunction with Cobblestone's technical expert Dr. Tim Williams to conduct an extensive apportionment analysis such that his royalty bases were tied to the economic benefits of each Defendant from its use of each Asserted Patent. He employed royalty bases specific to each patent and each defendant, and also conducted further apportionment by adjusting the rates from comparable license agreements. Dell properly apportions to only capture the value of the patented inventions to each Defendant. And Dell's approach does not run afoul *Broadcom* because he uses a single hypothetical negotiation applying an infrastructure-related royalty rate from comparable license agreements to infringement involving each Defendant's use of such infrastructure.

Defendants' complaints appear to rather be rooted in their allegation that "Cobblestone [is] seeking over *$400 million* for infringement of just three patents," failing to mention that this damages amount is across the three cases against the carrier Defendants. Mot. at 1 (emphasis in original). Regardless, the size of the damages awards is, of course, not a reason to exclude expert testimony, as the focus of *Daubert* is on the methodologies used by that expert.

II. OVERVIEW OF DELL'S OPINIONS AND METHODOLOGIES

A. **Dell apportioned royalty bases for each Defendant on a patent-specific basis to be limited to use of and benefits tied to the patented features.**

Dell relied on analysis from Williams to conduct numerous steps to apportion the royalty base for each Asserted Patent for each Defendant. This was necessary because Dell "underst[oo]d from Dr. Williams some portion of [each] Defendant's subscribers may not make use of the

1

infringing features offered by [the] Defendant at all times." Ex. A ¶85; Ex. 1 ¶82; Ex. 2 ¶79. Thus, he "analyzed evidence produced by [each] Defendant[] related to purchases of accused baseband units, radio/antennas and related equipment, equipment location details, equipment specification and technical details, monthly subscriber data and 5G usage/traffic data" to tie his royalty bases to each Defendant's infringement. Ex. A ¶85; Ex. 1 ¶82; Ex. 2 ¶79.

As he explains in his reports, Dell "start[ed] by determining the total number of subscribers (and associated subscriber months) that make use of [each] Defendant's accused cellular network." Ex. A ¶86; Ex. 1 ¶83; Ex. 2 ¶80. He then "appl[ied] the portion of traffic/usage over the cellular network that [each] Defendant indicates is attributed to 5G data/traffic to the number of subscriber months in order to apportion and account for any portion of subscribers that did not make use of the 5G cellular network." Ex. A ¶86; Ex. 1 ¶83; Ex. 2 ¶80. This is because Dell "underst[oo]d from Dr. Williams that the Accused Instrumentalities include 5G NR base station systems," and "this includes the portions of Defendants' 5G NR cellular network in which there is at least one node having at least one baseband unit and one massive MIMO radio." Ex. A ¶76; Ex. 1 ¶76; Ex. 2 ¶73; *see also* Ex. A ¶¶77-84; Ex. 1 ¶¶77-81; Ex. 2 ¶¶74-78. However, as described below, Dell did not stop there—he further apportioned the bases using information specific for each Asserted Patent.

    1.  Step 1A: '347 Patent-Specific Apportionment

For the '347 Patent, Dell "further apportioned the royalty base to account for only the portion of the 5G network (or subscribers) that are able to make use of … massive MIMO FR1 and FR2 base stations … meeting certain criteria." Ex. A ¶86; Ex. 1 ¶83; Ex. 2 ¶81. In particular, "[i]n order to identify the specific massive MIMO base stations that are corresponding to the massive MIMO beamforming and link adaptation features asserted to infringe the '347 patent[] at issue, Dr. Williams explained to [him] the specific parameters and technical specifications that are required." Ex. A ¶87; Ex. 1 ¶84; Ex. 2 ¶82. For all Defendants, "[b]ased on discussions with Dr.

2

▮▮▮

Williams, [he] first filtered the produced data to include only those basebands which are accused basebands supporting massive MIMO beamforming with link adapation. Next, [he] filtered the radios/antennas used in combination with accused basebands to only those nodes which are identified by Williams as using massive MIMO radios/antennas." Ex. A ¶88; Ex. 1 ¶85; Ex. 2 ¶83.

Dell applied additional case-specific filters for each Defendant to avoid capturing technology not encompassed by the asserted claims of the '347 Patent. For AT&T, "[t]o be conservative, [he] applied another filter to only include bands … identified by Dr. Williams as bands capable of massive MIMO." Ex. A ¶88. He then multiplied the percentage of basebands that met these requirements ▮▮▮

▮▮▮

For T-Mobile, "based on discussions with Dr. Williams, [he] then filtered to isolate to only 5G technology by filtering to only include NR and MSMM technology and removing all 4G basebands. For Nokia only, [he] then filtered the Duplex mode to those that hit on at least TDD. Conservatively, [he] further filter[ed] to include [certain] layers …. Similarly, for Ericsson, [he] filtered to include [certain] bands …." Ex. 1 ¶86. "All bands and layers filtered have been identified by Dr. Williams as bands capable of massive MIMO." Id. Dell then multiplied the percentage of

▮▮▮

For Verizon, Dell "then applied another filter to isolate the nodes to only '5G UWB' technology, which further concentrates on the utilization of massive MIMO beamforming in the

---

1 ▮▮▮, which is fewer than half for the shorter period of 2020-2023.

3

███████████████████████████████████████

mid-band or in the high band" because he "underst[oo]d from Dr. Williams that this results in a fraction of the 5G NR network corresponding to the massive MIMO beamforming and link adaption feature asserted to infringe." Ex. 2 ¶84. Next, he multiplied ████████████

████████████████████████████████████████████████████████

████████████████████████████████████

### 2. Step 1B: '361 Patent-Specific Apportionment

Similarly, for the '361 Patent, he "further apportioned the royalty base to account for only the portion of the 5G network (or subscribers) that are able to make use of … FR1 TDD SA base stations … meeting certain criteria." Ex. A ¶86; Ex. 1 ¶83; Ex. 2 ¶81.

For AT&T, "[b]ased on discussions with Dr. Williams, [he] first filtered the produced data to include only basebands identified by Dr. Williams as accused. [He] then filtered the data to include only band N77, identified by Dr. Williams as capable of massive MIMO. Additionally, [because he] underst[oo]d from Dr. Williams the feature necessary to infringe the '361 Patent was

███████████████████████████████████████████████████████

██████████████████████ Furthermore, [he] underst[oo]d the ██████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████ Dell thus filtered out all AT&T base stations Williams did not identify as infringing the '361 Patent, and applied apportionment factors ██████████████████████████████████ to reduce the subscriber months in his base accordingly. Ex. A, Attmt. 3.2, 3.2A; Ex. F, Attmt. 3.2, 3.2A.

████████████████████████████████████████████████████

█████████████████ "Next, the data is filtered to including only basebands identified by Dr. Williams as accused against the '361 Patent. The data [was] filtered by ██████████████

███████████████████████████ Furthermore, according to Dr. Williams, the feature

4

necessary to infringe the '361 Patent was first included in ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* Dell thus filtered out all T-Mobile base stations Williams did not identify as infringing, and applied apportionment factors ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

For Verizon, Dell applied a filter to determine the number of "5G base stations with Featurestate indicated as 'activated'" because he understood from discussions with Williams that this is a way ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ by the '361 Patent." *Id.*; *see also id.* ¶87.

### 3. Step 1C: '888 Patent-Specific Apportionment[2]

Finally, for the '888 Patent, Dell took a similar approach. In further apportioning his royalty base for T-Mobile, he explained in his report that "[b]ased on discussions with Dr. Williams, [he] underst[oo]d that for a node to be an Accused Instrumentality, excluding LTE FDD, it must have both an IRAT band … and B41 band." Ex. 1 ¶90. He then determined what percentage of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* He ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.*

### B. Step 2: Dell derives a royalty rate for each Asserted Patent based on his analysis the *Georgia Pacific* factors, including his analysis of comparable licenses Intervenor Ericsson produced in this case.

In his analysis of *Georgia Pacific* Factor 12, Dell analyzed a number of license agreements produced by Intervenor Ericsson that contain specific royalty rates paid for cellular technologies

---

[2] Because AT&T and Verizon's use of inventions practicing the asserted claims of the '888 Patent has been *de minimus*, Dell only offers an opinion on the rate per subscriber month that the parties would agree to at the hypothetical negotiation and offers no opinions on the royalty base for those Defendants. This section therefore only addresses T-Mobile.

5

███████████████████████████████████████████████

for use in infrastructure equipment, such as base stations. Ex. A ¶¶225-296, 379-380; Ex. 1 ¶¶230-302, 385-386; Ex. 2 ¶¶204-275, 358-359; *see also* Ex. 4 at 148:20-24. Based on his detailed analysis of these licenses, and his understanding of Williams unchallenged technical comparability opinion (*see* Dkt. No. 153), Dell concluded that ███████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████ (Ex. A ¶369; Ex. 1 ¶375; Ex. 2 ¶348), which is the "range of infrastructure royalty rates" Dell identified from Ericsson's license agreements for comparable technologies (Ex. A ¶¶379-381; Ex. 1 ¶¶385-387; Ex. 2 ¶¶358-360; *see also* Ex. 4 at 74:22-76:14).

Because the Asserted Patents relate to, and the Accused Functionalities are implemented in, 5G-compliant infrastructure equipment (*see, e.g.*, Ex. A ¶76; Ex. 1 ¶76; Ex. 2 ¶73), in his analysis of *Georgia Pacific* Factor 13, Dell further apportioned the ████████████████ to determine per-patent royalty rates. He did this by determining the portion of Ericsson's 5G patent portfolio that is *declared* as essential to the 5G standard is, in fact, *actually* essential and thus subject to the comparable licenses. Relying on well-known and industry-accepted sources, as well as his own actual real-world licensing experience, he concluded that "industry studies and empirical analysis indicate that ██████████████████████████████████

█████████████████████████ Ex. A ¶380; Ex. 1 ¶386; Ex. 2 ¶359; *see also* Ex. A ¶¶375-380; Ex. 1 ¶¶381-386; Ex. 2 ¶¶354-359 (emphasis in original); Ex. 4 at 96:5-112:20. Using this empirical data, Dell then applied the ████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████ Ex. A ¶¶374-380; Ex. 1 ¶¶380-386; Ex. 2 ¶¶353-359. Dell then divided the above range of rates for infrastructure equipment from Ericsson's produced license agreements ████████████████████████████████████████████████ to obtain an apportioned

██████████████████████████████████

per patent royalty rate ranging from ████████████ Ex. A ¶381; Ex. 1 ¶387; Ex. 2 ¶360.

Finally, to determine his ultimate rate, Dell applies these apportioned per patent rates to each Defendant's economic benefit from its cellular infrastructure, monthly average revenue per user (ARPU)—what a subscriber pays to get access to each Defendant's network that benefits from use of the Asserted Patents. ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

In his *Georgia-Pacific* Factor 15 analysis, Dell explained the parties to the hypothetical negotiation would negotiate toward the upper end of the above ranges of the '347 and '361 Patents, and towards the lower end of the range for the '888 Patent. Ex. A ¶¶405-407; Ex. 1 ¶¶411-413; Ex. 2 ¶¶384-386. ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████

**C.     Step 3: Dell applies his computed royalty rates to the apportioned number of each Defendants' subscriber months for each Asserted Patent.**

For each Defendant, Dell then takes his apportioned royalty bases for each Asserted Patent, and multiplies it by the apportioned per patent royalty rates for each patent for that Defendant, to arrive at overall undiscounted amounts of damages for each patent. Ex. A ¶410; Ex. 1 ¶¶416-417; Ex. 2 ¶389. Dell then discounts the applicable royalty payment amounts back to the date of the hypothetical negotiation to calculate the total net present value of the royalty payments that he opines would be paid as a lump sum royalty payment. Ex. A ¶410; Ex. 1 ¶¶416-417; Ex. 2 ¶389.

7

### III. ARGUMENT

#### A. Dell's use of the apportioned number of subscriber months is reflective of the value of the patented technology to Defendants.

Dell employs a single tier, single hypothetical negotiation model applying an infrastructure-related royalty rate from comparable license agreements to the economic benefit from infringement based on each Defendant's use of such infrastructure. *See supra* § II.

Defendants' argument against Dell's royalty base—number of "subscriber months," which is akin to subscriber revenue—is grounded in misapplication of Federal Circuit precedent. Dell's methodology does not "run[] directly afoul of" *Caltech v. Broadcom*, as Defendants urge. Mot. at 8. *Broadcom* concerned a model employing multiple rates in a "wholly contrived" series of hypothetical negotiations "contrary to the customary way patent infringement disputes are ordinarily resolved." 25 F.4th 976, 994 (Fed. Cir. 2022) . In the same case, Caltech sued Broadcom for selling WiFi chips and Apple for selling products incorporating those same chips. *Id.* at 981-82. Notwithstanding it had sued both the chip manufacturer (Broadcom) and device-maker (Apple) in a single case, Caltech argued it would have engaged in ***two separate hypothetical negotiations***: one with Broadcom with its sales to Apple excluded, and a second negotiation with Apple for its use of Broadcom's chips.[3] *Id.* at 993. Using this structure, Caltech argued Apple should have a "***vastly different royalty rate***"[4] than Broadcom even though the ***licensed products were identical***. *Id.* The panel found the "two-tier" negotiation for the same products in the same case created an "artificial" and unsupported double-hypothetical negotiation scenario. *Id.* at 992-94.

Dell's opinion bears no resemblance to *Broadcom*. In these cases, each against a single

---

[3] These two separate hypothetical negotiations would apply to two separate and distinct levels within the supply chain, where Broadcom manufactures chip components that are supplied to Apple for their incorporation into Apple's cellular and consumer electronics device products.

[4] Emphases added unless otherwise indicated.

8

Defendant (at the same level in the supply chain), Dell relies on a royalty rate range related to infrastructure equipment derived from Ericsson licenses. *See supra* § II.B. Defendants challenge neither Dell's economic, nor Williams' technical, comparability analyses for those licenses. Mot.; Dkt. No. 153. In ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See supra* § II.B. Here, Dell applies properly ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *See supra* §§ II.B-II.C. Moreover, Dell, based on Williams' unchallenged technical opinions (Dkt. No. 153), conducts multiple apportionment steps for each Defendant, separately for each Asserted Patent, to limit the number of subscriber months to only the portion of the subscribers that benefit from the use of that Patent. *See supra* § II.A; *see also* Ex. A ¶83; Ex. 1 ¶80; Ex. 2 ¶77 ("[I]t is my opinion that the appropriate royalty base in this case consists of monthly subscriptions and associated revenues that correspond to the 5G NR Accused Instrumentalities which are found to infringe the Patent at Issue ***and that benefit from Defendants' making and use of these Accused Instrumentalities***."); Ex. 4 at 128:12-129:18. Thus, in stark contrast to *Broadcom*, Dell posits a single hypothetical negotiation for each Defendant, and applies the properly apportioned ***same royalty rates*** to the economic benefits realized by each Defendant that is specifically tied to the benefits of each Asserted Patent.

Beneath these fundamental differences, *Broadcom*'s reasoning also does not support Defendants' motion. *Broadcom* is grounded in principles of exhaustion and "double recovery": "Once full recovery is obtained from one infringer with respect to a particular infringing device, at most nominal damages may be awarded against another with respect to the same device." *Broadcom*, 25 F.4th at 994 (quoting *Stickle v. Heublein*, 716 F.2d 1550, 1562 (Fed. Cir. 1983)).

9

Neither concern is implicated by Dell's methodology. Dell is not opining there would be a separate negotiation for the Defendants after their suppliers, such as Intervenors, obtained a license. Dell's model also does not implicate principles of "double recovery" or exhaustion. Cobblestone is **not** accusing Defendants' suppliers in this case, and is thus not seeking a second royalty for any product that was, or could have been, licensed by any other hypothetical negotiation.

This Court has confirmed opinions such as Dell's, which posit a single hypothetical negotiation for the infringement at issue, are not subject to *Broadcom*'s prohibition of "two-tiered" models for the same product. *Alacritech v. CenturyLink*, 2023 WL 6553832, at *10 (E.D. Tex. 2023) (denying part of motion to exclude expert because "[i]n contrast to [*Broadcom*], Mr. Hansen only offers opinions on behalf of Intel [a single defendant]—not on behalf of Intel and Dell").

Recently, the *Regents of Univ. of Minn. v. AT&T Mobility* court rejected the exact argument Defendants make here—that applying a rate from a comparable component manufacturer license to a base of AT&T's "total subscriber revenue" violated *Broadcom.* 2024 WL 844579, at *6 (D. Minn. 2024). The court explained *Broadcom* had "factual differences … that weigh heavily against exclusion," in particular because the expert "us[ed] the same royalty rate for all entities in the supply chain and appl[ied] that to their respective revenues." *Id.* The same is true here.

Defendants' arguments boil down to their insistence that Dell needed to limit his base to ***costs*** they incurred to obtain infrastructure equipment, ***not to their economic benefit*** from their infringement. Mot. at 3 (citing Defendants' expert report applying "Dell's rates … to … ***infrastructure expenditures***"). Dell is not required to adopt Defendants' preferred methodology, particularly where it is contrary to precedent and economic sense.

Put simply, incurring costs, or purchasing products such as infrastructure equipment, is not infringement. Section 284 requires damages be "adequate to compensate ***for the infringement***, but

10

▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

in no event less than a reasonable royalty for the ***use made by the invention by the infringer*** ….." 35 U.S.C. § 284. The statute requires analysis of benefits from infringement and does not mention calculating damages based on "costs" to the infringer. In accord, the Federal Circuit has described comparing costs to an infringer for infringing equipment to its benefits gained from infringement as "compar[ing] apples to oranges." *Pavo v. Kingston*, 35 F.4th 1367, 1379 (Fed. Cir. 2022). Another court in this district has likewise rejected valuing infringement based on an infringer's costs. *CSIRO v. Cisco*, 2014 WL 3805817, at *11 (E.D. Tex. 2014) ("Basing a royalty solely on chip price is like valuing a copyrighted book based only on the costs of the binding, paper, and ink needed to actually produce the physical product. While such a calculation captures the cost of the physical product, it provides ***no indication of its actual value***."), *vacated on other grounds*, 809 F.3d 1295, 1303 (Fed. Cir. 2015). The concept of using subscriber revenue as a base should not be foreign to Defendants; ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇

▇▇▇▇▇▇▇▇▇ Ex. 2 ¶106; Ex. 4 at 145:12-146:19; Ex. 3 at 22:23-24:11.

Moreover, Defendants' argument also makes little sense on an economic level because their argument, as opposed to Dell's opinion, suggests a "wholly contrived" negotiation. In essence, Defendants argue that *Broadcom* places a *de facto* "most favored nation" clause in the hypothetical negotiation, whereby any infringement of technically comparable patents must, as a matter of law, have the same exact royalty as the hypothetical royalty if there is any conceivable supplier relationship. There is no factual or economic indication that Cobblestone or any licensor would agree to such artificial restraints at the hypothetical negotiation. And as detailed above, this is not what *Broadcom* holds. In short, *Broadcom* simply does not require the exclusion of Dell's opinion that each Defendant's royalty base is the benefit it gained from infringement.

**B.    Dell does not invoke the entire market value rule, but rather apportions his royalty bases to only capture revenue directly tied to infringing functionalities.**

11

Dell did not violate the EMVR or fail to apportion. Dell does ***not*** use all subscribers, or all subscriber revenues, as his royalty bases. Rather, he conducted a patent- and Defendant-specific analysis with the aid of Williams to calculate apportionment factors for the incremental value provided by the infringing features over conventional technology and non-infringing features. *See supra* § II.A. For example, for the '347 Patent, Dell recognizes each subscriber benefits from conventional 4G LTE and non-infringing 5G technology, both of which must be apportioned out. Ex. A ¶85; Ex. 1 ¶82; Ex. 2 ¶79. Dell's apportionment factors limit his base to the portion of the network directly attributable to the infringing massive MIMO beamforming and link adaptation features. *See supra* § II.A. This analysis focuses on the incremental benefit from the patented technology and uses available data from Defendants to quantify that benefit. *Id.* There is no requirement Dell apportion in only one way or that he assign separate economic value to every conventional or non-infringing feature individually. Defendants cite no case requiring that approach, identify no evidence enabling such an approach, and performed no such analysis of their own. Their criticism is for cross-examination, not exclusion. In any event, Dell's apportionment *does* exclude subscriber value attributable to the core telephone network and other conventional or non-infringing 5G technologies, at least by excluding all value for the LTE network and the majority of (non-infringing) 5G bands, basebands, radios, and deployments. *See supra* § II.A.

Defendants' EMVR cases are also inapposite. Mot. at 9-11. In *Laser Dynamics v. Quanta Computer*, the expert applied 2% to all laptop sales, which "by definition, is application of the entire market value rule." 694 F.3d 51, 68 (Fed. Cir. 2012). And the expert in *Uniloc v. Microsoft* used "an effective royalty rate of approximately .0000035%" and applied that rate to the un-apportioned "approximately $20 billion in sales of infringing product." 632 F.3d 1292, 1320 (Fed. Cir. 2011). Dell's reports contain no such opinions; there are no EMVR opinions to exclude.

Moreover, Defendants' alleged concern Dell "intends to tell the jury that the royalty base ▇▇▇▇ is, at best, misplaced. Mot. at 9 (emphasis in original). He has never offered that opinion. Nor could he. This is because Defendants have taken the **sum of the entirety of AT&T, T-Mobile, and Verizon's subscriber revenue** to arrive at this ominous ▇▇▇▇, ignoring that there will be a separate trial for each Defendant and Dell does not use such revenue for his bases. There is no risk Defendants' ▇▇▇▇ fear will come to fruition.

### C. Dell does not ignore the purchase price of the Asserted Patents.

Defendants are incorrect "Dell completely ignores the value Cobblestone *actually paid* to acquire the Patents-in-Suit." *Id.* at 13 (emphasis in original). He describes this transaction and concludes "the price that Cobblestone paid for the Patent at Issue is not indicative of an *established royalty*, nor is it economically comparable, for a license to the Patents at Issue and is therefore of limited relevance to the respective hypothetical negotiations in this matter." Ex. A ¶¶98-105; Ex. 1 ¶¶99-106; Ex. 2 ¶¶95-102 (emphasis in original). Defendants point to no reason why this opinion is a ground to exclude any of Dell's opinions. Rather, they admit "the amount paid for a patent does not represent a cap on its value." Mot. at 14. If Defendants disagree with Dell, they can cross-examine him and present contrary evidence.

### D. Dell's 3-5% essentiality approximation for Ericsson's declared 5G patents is sufficiently tied to the facts of the case.

Dell concluded "industry studies and empirical analysis indicate that approximately 3% to 5% of declared essential patents are *actually* essential to the cellular standard," and he used these values to apportion rates in comparable SEP licenses to a per-patent family figure. Ex. A ¶380; Ex. 1 ¶386; Ex. 2 ¶359 (emphasis in original); *see supra* § II.B. His analysis is based on the number of Ericsson patent families covered by the license, and he applies the 3-5% figure to aid in his apportionment; he is not saying the royalty rate *in this case* should be 3-5%. Nonetheless,

13

Defendants claim this is akin to the generalized 25% rule of thumb rejected in *Uniloc*. Defendants' arguments are misplaced and mischaracterize Dell's analysis. First, *Uniloc* is not applicable here. The problem in *Uniloc* was the 25 percent had no nexus to "any particular technology, industry, or party." *Id.* at 1317.

And unlike in *Uniloc*, Dell is deriving an effective rate by using the 3% to 5% as an adjustment factor sufficiently tied to the case and the SEP portfolios licensed by Ericsson specifically. *See supra* § II.B. Among other sources, he relies on an article published in the IPO Law Journal to obtain these values. Ex. A ¶375; Ex. 1 ¶381; Ex. 2 ¶354 (citing Ex. M). This article is entitled "Trends in Technology IP Licensing," and was written by Terry Ludlow, Founder and CEO of Chipworks. Ex. M at 1; *see* Ex. 4 at 102:24-103:21. Ludlow and Chipworks provide services to "**semiconductor and electronics** companies," namely "reverse engineering services to companies seeking to build a competitive advantage, and protect and grow the potential of their intellectual property." Ex. M at 10-11. Given his extensive experience in this space, Ludlow's statement "that **3% - 5%** of patents in a large portfolio are 'valuable,'" such that they "are the deal drivers for licensing, litigation, and sales," is through that electronics-focused lens. *Id.* at 3. Indeed, all examples he provides are in the electronics space. *Id.* at 2-5 (discussing, among others, **Ericsson**, Nokia, Panasonic, IBM, Apple, Samsung, Micron, RIM, Sony, Lenovo, Nortel, Cisco, and Qualcomm in the context of patent deals and litigation). Thus, Dell's use of 3% to 5% to determine per patent rates "is sufficiently tied to the facts of the case to be admissible" because both the patents discussed in the Ludlow article and "[t]he patents-in-suit are **patents related to electronics**." *Odyssey Wireless v. Apple*, 2016 WL 7644790, at *12 (S.D. Cal. 2016); *see Sprint v. Charter*, 2021 WL 982729, at *6 (D. Del. 2021) (in non-SEP case, denying motion to exclude and noting "the skewed distribution of patent value" is "an accepted rule"). Notably, *Odyssey* is a SEP

14

case in which the court denied a motion to exclude expert opinion rooted in the Schankerman article to provide an estimation "that the top 10 percent of *patents related to electronics* carried approximately 84 percent of all value associated with these patents. 2016 WL 7644790, at *12. Schankerman is one source Dell relies on to opine that a small number of patents in a portfolio drive value. Ex. A ¶¶377-378; Ex. 1 ¶¶383-384; Ex. 2 ¶¶356-357 (citing Exs. 5, 7). And a University of Pennsylvania Law Review article (Ex. A ¶375; Ex. 1 ¶381; Ex. 2 ¶354 (citing Ex. 6)) further supports his reliance on Ludlow's range, as it indicates "most estimates suggest that *less than 5%* of patents have any apparent value at all." Ex. 7 at 5138 n.3; Ex. 4 at 111:12-112:1.

Defendants also claim there is "no correlation between a patent's purported 'value' and whether it is 'actually essential.'" Mot. at 15. But in fact, essentiality makes a patent more valuable because an actually essential patent is both valid and infringed by users of the standard. Thus, courts have applied "skewed distribution of patent value" estimations in the SEP context. *See, e.g.*, *In re Innovatio IP Ventures Patent Litig.*, 2013 WL 5593609, at *43 (N.D. Ill. 2013) (applying estimation of valuable electronics patents to a portfolio of "3000 potentially essential [Wi-Fi] patents" in recognition "of the fact that many of those 3000 patents are likely less valuable to the standard … because their essentiality has not been judicially confirmed"); *Odyssey*, 2016 WL 7644790, at *12 (applying estimation of valuable electronics patents to an LTE patent portfolio). Moreover, the comparable licenses Dell considers explicitly license only *actually* essential patents, so his analysis additionally aids him in understanding the true number of patents actually licensed by those agreements, to aid in his comparability and apportionment opinions. *See, e.g.*, Ex. A ¶255; Ex. 1 ¶260; Ex. 2 ¶234

Ex. A ¶282; Ex. 1 ¶288; Ex. 2 ¶261

15

|  |  |
|---|---|
| Dated: July 17, 2024 | Respectfully submitted,<br><br>*/s/ Amy E. Hayden*<br>Marc Fenster<br>CA State Bar No. 181067<br>Reza Mirzaie<br>CA State Bar No. 246953<br>Neil A. Rubin<br>CA State Bar No. 250761<br>Amy E. Hayden<br>CA State Bar No. 287026<br>James Pickens<br>CA State Bar No. 307474<br>Christian W. Conkle<br>CA State Bar No. 306374<br>Jonathan Ma<br>CA State Bar No. 312773<br>RUSS AUGUST & KABAT<br>12424 Wilshire Blvd. 12th Floor<br>Los Angeles, CA 90025<br>rak_cobblestone@raklaw.com<br><br>Andrea Fair<br>Ward Smith & Hill, PLLC<br>1507 Bill Owens Parkway<br>Longview, Texas 75604<br>andrea@wsfirm.com<br><br>**Attorneys for Plaintiff,**<br>**Cobblestone Wireless, LLC** |

16



## CERTIFICATE OF SERVICE

The undersigned hereby certifies that this document is being served on all counsel of record via email on July 17, 2024.

/s/ Amy E. Hayden
Amy E. Hayden